**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-311 (RDM)** |
| **v.** | : | |
| | : | |
| **PATRICK O'BRIEN,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Patrick O'Brien to 60 days' incarceration, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.      Introduction

Defendant Patrick O'Brien, a fifty-five year old small business owner, and former Buck Sergeant in the United States Air Force, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

O'Brien pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. The government's recommendation is supported by the defendant's actions, specifically that O'Brien: (1) brought his minor son with him into the Capitol on January 6, as it was being ransacked by rioters; (2) O'Brien was in the Capitol for a substantial period of time, roughly 28 minutes, parading around with his Gadsden flag, and in that time, he and his son jubilantly chanted and roamed throughout large portions of the building; and (3) O'Brien took no action to restrain his minor son as he stole a mousepad from an unmanned security desk;[2] and (4) O'Brien continues to minimize his conduct that day and show no remorse for his actions.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of O'Brien's crime support a sentence of 60 days' incarceration.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense) at ¶¶ 1-7.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] O'Brien's son was not charged in connection with his acts at the U.S. Capitol on January 6, 2021, because he was a minor at the time. Accordingly, O'Brien's son's face is redacted in many of images contained in this filing.

*Defendant O'Brien's Role in the January 6, 2021 Attack on the Capitol*

O'Brien and his son drove from their home in Montana over the course of three days, driving 13 hours per day, in order to attend former President Trump's "Stop the Steal" rally. Earlier in the day of January 6, 2021, while standing near Freedom Plaza, O'Brien and his son gave an interview with a man who posted the interview on his Facebook livestream. During the interview, the two acknowledged they were father and son and that they came to Washington D.C. to support former President Trump because they believed the 2020 election had been stolen. *See* Image 1.



*Image 1 - Still shot from the Facebook video clip interview. See Ex. 1 (2:08 minutes long)*

After attending the rally, O'Brien and his son walked to the Capitol building. At approximately 2:00 p.m., rioters forced their way onto the restricted grounds of the U.S. Capitol. *Id.* at 5. O'Brien and his son advanced to the Upper West Terrace of the Capitol and stood on the stairs of the Capitol with other rioters who had overrun this restricted area.



*Image 2 - O'Brien watching other rioters use bike racks to get closer to the Capitol building.*

Rioters made their way up the west side of the Capitol grounds to the Senate Wing Door. There, rioters smashed glass windows and kicked at the Senate Wing Door from the outside in an attempt to gain entry to Capitol building. At approximately 2:13 p.m., the Capitol building was first breached by a rioter who jumped through a broken window adjacent to the Senate Wing Door.

Shortly thereafter, at approximately 2:26 p.m., O'Brien and his son joined a crowd that was pushing their way into the building through the Senate Wing Door, ultimately gaining entry through the same entry point that had been violently breached by other rioters less than fifteen minutes earlier. Although O'Brien and his son walked through the already-breached door, there were other rioters climbing in through the broken windows beside them, which they were able to observe. *See* Images 3 and 4.



*Image 3 – Still shot of O'Brien and his son lining up to enter through the Senate Wing Door with O'Brien circled in yellow. See Ex 2 at 5:47-5:50 timestamp.*



*Image 4 – Still shot of CCTV of O'Brien (circled in yellow) entering Capitol building as other rioters climb through windows next to him. See Ex. 3 at 00:41-00:53*

Once inside the Capitol building and carrying his Gadsden flag, O'Brien and his son went into the Crypt as depicted in Image 5.



*Image 5 – Still shot of CCTV of O'Brien and his son in the Crypt at approximately 2:28 p.m.
with O'Brien circled in red.*

The two then moved up the stairs with a crowd of rioters and walked along the hallways

of the building. As they are walked, the crowd around them cheered "USA! USA!" and "Who do

they work for?  US," and later, repeatedly, and in a menacing tone, "Nancy, Nancy."



*Image 6 – Screenshot from public source video showing rioters chanting as O'Brien ascended
the stairs at approximately 2:30 p.m. O'Brien circled in yellow. See Ex. 4 at 26:50 and 27:27.*



*Image 7 – Photo of O'Brien (circled in yellow) ascending the stairs to the Rotunda.*

O'Brien and his son then walked through the halls with a group of rioters who can be heard shouting, "Defend your liberty!  Defend your Constitution!"



*Image 8 – Still shot of O'Brien walking through the halls of the Capitol building with O'Brien circled in yellow.*

O'Brien and his son walked to the main entryway of then Speaker Nancy Pelosi's office, where O'Brien had his son take a photograph of him while he posed cheerfully with his flag as shown in Image 9.



*Image 9 – Still shot of O'Brien in front of Pelosi's office door with O'Brien circled in yellow. See Ex. 5 at 2:35-2:43.*

O'Brien and his son then ran down the hall, ultimately finding themselves in front of the entrance to the Senate, from which former Vice President Mike Pence had been evacuated at 2:26 p.m. There, O'Brien watched as his son stole a mousepad off the unoccupied desk and placed it in his pants pocket as depicted in Image 10.



*Image 10* – Still shot *CCTV Footage of O'Brien looking on as his son stole a mousepad from a security desk with O'Brien and his son circled in red. See Ex. 6.*

O'Brien and his son then make their way toward the Rotunda, where they walked around before ultimately leaving from the East Doors at approximately 2:53 p.m. O'Brien was inside the Capitol for approximately 28 minutes. *See* Images 11-14.



*Image 11* – Still shot of CCTV footage of O'Brien and his son (circled in red) walking through the halls of the Capitol.

9



*Image 12 –Still shot of CCTV video of O'Brien and his son (circled in red) running through the halls of the Capitol.*



*Image 13 – O'Brien (circled in yellow) and his son in the Rotunda.*



*Image 14 – Still shot of CCTV video of O'Brien and his son (circled in red) exiting the Capitol Building at approximately 2:53 p.m.*

*Interview with O'Brien*

On January 18, 2023, pursuant to the terms of his plea agreement, O'Brien, with counsel present, met with government counsel and the lead FBI agent on this case. During the interview, the only remorse O'Brien seemed to express was the fact that he got caught and that he and others present at the Capitol that day continue to be portrayed as "insurrectionists," a label with which he disagrees. O'Brien relayed that he came to DC to support President Trump in what he believed, and still believes, was a fraudulent election.  O'Brien stated that he bases this belief on news reports of stuffing ballot boxes, falsified early and absentee voting, and the fact that many of the cases brought in court to challenge the election were thrown out due to lack of standing and not on the merits. When asked where he gets his news, O'Brien advised he goes to news

11

aggregate sites such as "Liberty Daily" and "Gateway Pundit." He said he does not care for or use social media other than to promote his businesses and does not obtain his news there.

O'Brien stated that after three days of driving, he and his minor son arrived in Washington D.C. on January 5, 2021 and left on January 7, 2021. He stated the two slept in their vehicle the entire trip and did not go to hotels. O'Brien advised that he took his son on this trip because his son wanted to come along and that they wanted sights in D.C. and to attend the "Stop the Steal" rally. Those reason make sense, but that is not all they did on their trip. Following the rally, where they had to abandon their backpack with snacks and water due to security measures and magnetometers, O'Brien and his son walked down to the Capitol with others. O'Brien stated that one of the main reasons why they went into the Capitol was the perception that they could get Congress to hear what the people had to say. Despite relaying that he saw flash bangs, rubber bullets, and tear gas being deployed into the crowd by officers, he remained steadfast that it was not clear he could not be there. He stated that if someone had just told him he could not be there, he would have left. In his telling, O'Brien stated that he saw police officers using these weapons or tactics against women and children in the crowd, and yet he did not turn around and leave. He also advised he saw violence against police, people smoking marijuana in the Capitol, people breaking windows and then climb in through those same windows, while at the same time advising that he did believe that had to leave the grounds and the building immediately. O'Brien also advised that as things got more intense, his only thought was to keep his son safe.

The overall impressions to be gleaned from O'Brien's version of events is revisionist history, minimization, and hypocrisy. To state it was peaceful while at the same time admitting that he saw multiple assaults, heard people angrily chanting for "Nancy" and heard a gunshot while inside is nonsensical. In addition, he noted that watching people disrespect the Capitol

made him angry, yet he did nothing when his minor son stole a mousepad off a security desk. And finally, O'Brien, who said his primary concern was his son's safety instead took his son into a place beset by anger and violence and an utter disrespect for the rule of law.

At the end of the interview, O'Brien said he would likely not engage in such behavior again, and that in hindsight, he would have done things differently on January 6.  However, in no way did he seem remorseful, and his only real regret is getting caught breaking the law.  In fact, O'Brien said the reason he went inside the building, despite all signs telling him it was not legal or safe, was so that he would not "miss out" on what was going to happen next and not see it firsthand.

The actions O'Brien engaged in on January 6 were despicable.  In total, O'Brien and his son spent approximately 28 minutes inside of the Capitol, taking pictures, cheering, and laughing and waving his flag, and he did all of this with his minor child in tow.  O'Brien exposed his son to violence and rioting, and then turned a blind eye when his son stole something from the building.  And despite his efforts to minimize his actions that day, O'Brien's behavior on January 6 was not only unlawful, it was unconscionable.

*The Charges and Plea Agreement*

On September 12, 2023, the United States charged O'Brien by a four-count Information with violating 18 U.S.C. 1752 (a)(1) and (2) and 40 U.S.C. 5104 (e)(2) (D) and (G). On September 20, 2023, pursuant to a plea agreement, O'Brien pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. 5104 (e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.      Statutory Penalties

O'Brien now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days' incarceration, and 60 hours of community service.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing O'Brien's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like O'Brien, the absence of violent or destructive acts is not a mitigating factor. Had O'Brien engaged in such conduct, he would have faced additional criminal charges.

O'Brien entered the Capitol building at approximately 2:26 p.m. In order gain entry to the Capitol at that time, he would have crossed over broken-down barricades and passed by bike racks that were intended to prohibit entry into the restricted area of the Capitol's grounds, but which had been pushed aside. Although O'Brien may not have physically engaged with the police himself, O'Brien was an essential part of the mob that overwhelmed the police through its sheer numbers. Without his presence – like the many other rioters who did not turn away from the violence but rather advanced forward toward it – the crowd would not have attained the numbers necessary to overwhelm the police lines.

While inside the Capitol and over the course of approximately 28 minutes, O'Brien jubilantly joined in the rioting. He walked among throngs of rioters chanting "Nancy, Nancy," and CCTV captured him smiling and cheering.

Most notable, though, was the fact that O'Brien brought his then minor son with him to a riot, and he exhibited no qualms about having his son unlawfully enter the Capitol building while it was visibly under siege. O'Brien later watched as his son took a mouse pad off a security desk as a souvenir and place it in his pocket. By taking no action to restrain his child, O'Brien tacitly approved the theft.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 60 days' incarceration in this matter.

### B.  O'Brien's History and Characteristics

As set forth in the PSR, O'Brien is a fifty-five-year-old man who is father, husband, and small business owner currently living in Montana. PSR ¶¶ 37-39. O'Brien has no criminal convictions, and he attended college for a period of time before leaving to work. PSR ¶¶ 26-32, 48-51. From 1986 to 1991, O'Brien served in the United States Air Force. He received an

Honorable Discharge in 1991 at the rank of E4 and title of "Buck Sergeant." He did not participate in front line fighting but was involved in an annual military exercise in Germany. O'Brien ended his military service after his unit changed duty stations. PSR ¶ 47.  Since 2009, O'Brien has been self-employed as a restaurateur, and his business is profitable. Prior to owning the restaurant, O'Brien worked as a home repairman and rancher for approximately ten years.

While O'Brien's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, O'Brien would have understood that a person does not have the right to enter restricted government buildings. His voluntary decision to storm a guarded government building is disturbing in light of his former military service and training. In this case, O'Brien's conduct and former military service demonstrates a need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly

no greater factor that this Court must consider.

*Specific Deterrence*

O'Brien's conduct on January 6 demonstrates the need for specific deterrence. O'Brien ignored the violence taking place on the grounds of the Capitol between rioters and police officers, and he chose to join the mob that stormed into the Capitol building.

Unlike some January 6 defendants, O'Brien has accepted responsibility for his actions by pleading guilty. However, as detailed above, he has not taken any steps to express sincere remorse for his actions on January 6, 2021.

With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. There is a need for specific deterrence in this case, so that O'Brien and his now adult-aged son are discouraged from engaging in future politically motivated violence in support of their political goals.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence O'Brien based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

O'Brien has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. Like O'Brien, they were charged with only misdemeanors and pled guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building.

For example, in *U.S. v. Nicholas Reimler*, 21-CR-239-RDM, the defendant entered the Capitol building through the Senate Wing Door at 3:07 p.m. and entered the Crypt three minutes later. Reimler remained in the building for 19 minutes before leaving on his own accord. Reimler was not present for property destruction or clashes with police.  He pleaded guilty and this court sentenced him to two months home confinement.  While O'Brien has some similar behavior to Kramer in that like O'Brien's son, Kramer stole a sign; however, Kramer left after two minutes inside the building while O'Brien remained for 28 minutes.  Further, O'Brien watched his son – a minor who he brought to the Capitol to partake in the riot – steal and did not admonish him or put

the mousepad back himself.  For those reasons the 30 days' incarceration that Kramer received is not a sufficient sentence to punish and deter O'Brien or others.

In *U.S. v. Philip Kramer*, 21-CR-413-EGS, the defendant brought a helmet to Capitol to be prepared for violence and filmed violent altercations between crowd and police on Capitol steps. Kramer entered the Capitol through the North Doors at 3:10 p.m. and stayed for two minutes. While entering, Kramer saw large "Do Not Enter" sign and stole it for a souvenir which he later threw away to avoid being caught. Kramer also pleaded guilty and was sentenced to one month incarceration.

Finally, in *United States v. Spencer*, 21-cr-147-CKK, Jenny Spencer, along with her co-defendant husband, brought her 14-year-old child into the Capitol and the facts of that case are very similar to this one. Spencer entered the Capitol at approximately 2:19 p.m. through the Senate Wing Door, close in time to when other rioters broke open this door and shattered the nearby windows in the initial breach of the Capitol.  O'Brien and his sone entered the building around this time and through the same door, and like O'Brien, Spencer was inside with her minor child for approximately 30 minutes. Further, Both Spencer and O'Brien witnessed violence against law enforcement officers, and both minimized their conduct to the FBI when interviewed.  Spencer pleaded guilty to the same charge as O'Brien, and the court sentenced Spencer to 3 months' incarceration. O'Brien remained in the building for 28 minutes and went to multiple locations in the building with his son, including posing for photos near Nancy Pelosi's office and watching while his son stole a mousepad.  For these reasons, sentencing O'Brien to 60 days' incarceration is an appropriate sentence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that O'Brien must pay $500 in restitution, which reflects in part the role O'Brien played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) O'Brien's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 85.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 60 days' incarceration, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on O'Brien's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Elizabeth N. Eriksen*

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Elizabeth N. Eriksen
VA Bar No. 72399
Trial Attorney, Detailee
601 D Street, N.W.
Washington, D.C. 20001
(202) 616-4385
Elizabeth.Eriksen2@usdoj.gov